CRAGGETT, Appellant,

v.

ADELL INSURANCE AGENCY, Appellee.

[Cite as *Craggett v. Adell Ins. Agency* (1993), 92 Ohio App.3d 443.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 63877.

Decided Dec. 13, 1993.

446

*Michael L. Thal,* for appellant.

*Larry C. Greathouse,* for appellee.

DONALD C. NUGENT, Judge.

Plaintiff-appellant, Daisy L. Craggett, appeals from the trial court's grant of defendant-appellee Adell Insurance Agency's ("AIA's") motion for summary judgment.

Craggett alleged that agents Harry Adell and Jerome Abraham, without her knowledge or consent, used monies accumulated in her annuity policy to purchase additional policies of insurance based on the lives of her son and grandchildren, thereby depleting the value of the annuity policy. Craggett claimed that Adell and Abraham knew she had purchased the annuity to provide her with an income upon her retirement and that they misrepresented or did not specifically advise her that she was contracting to buy additional life insurance policies or that these purchases would reduce the value of her annuity policy. Craggett further alleged that she never wanted or requested life insurance on her son or grandchildren.

AIA answered the complaint by denying Craggett's allegations and any liability. AIA subsequently filed a motion for summary judgment, arguing that no misrepresentations were made to Craggett and that her claim was time-barred by the statute of limitations.

The premise of the motion for summary judgment was that Craggett requested, applied for, and received life insurance policies on her son and two grandchildren and further requested and agreed to this optional payment program as evidenced by a Statement of Dividends and Endowments, signed by Craggett, which directed AIA to use the dividends and endowments from her annuity to pay the premiums due on the three life insurance policies.

The motion for summary judgment was supported by a memorandum of law, excerpts from Craggett's deposition, a copy of the annuity policy, three applications for life insurance signed by Craggett, the three life insurance policies, the affidavits of Larry Greathouse, Esq., Jerome Abraham, and Harry Adell, and a copy of the Statement of Dividends and Endowments signed by Craggett.

In response to the motion for summary judgment, Craggett filed a memorandum of law supported by her affidavit, a table showing the current value of her policies, a letter from Summit National Life Insurance Company, and her complaint.[1]

The following additional facts are derived from the materials filed in support of and in opposition to the motion for summary judgment.

Sometime in 1967, Charles Perry of the Pinkney–Perry Insurance Agency met with Craggett at her place of employment to talk to her about a new plan being offered through his agency. Perry told Craggett that this plan would help her finance her retirement. Perry described the plan as a twenty-one-year annuity program requiring annual premium payments of one thousand two hundred dollars. Perry told Craggett that at the end of the twenty-one years, she would receive a substantial lump sum payment, although he could not guarantee her the exact amount.

After discussing the program with her husband, Craggett applied for and was issued policy No. 67896 by Summit National Life Insurance Company (hereinafter "Summit"). Craggett acknowledged receiving a copy of the policy, but said she never actually read it.

A few years later, Craggett was contacted by AIA and was told it was taking over her account for the Pinkney–Perry Agency. AIA kept in regular contact with Craggett, often calling to let her know her premiums were being received and that everything was going well with her policy. Craggett would also periodically meet with agents Adell and Abraham to review her policy.

At one such review meeting in 1971, Craggett claims that Adell led her to believe that if she added her son's name to her annuity policy, his youth would somehow increase the value of the policy. Craggett said she did not really understand the nature of Adell's proposal, but that her husband, who was also present at the meeting, told her he understood and it was a good idea to add their son's name to the policy. Craggett said she went along with her husband and agreed to add her son, George E. Craggett, to policy No. 67896.

---

1. Craggett also attached to her response the affidavit of her son, Charles E. Craggett. This court, however, will not consider Mr. Craggett's affidavit in rendering its opinion, as the affidavit is not properly notarized.

On June 5, 1971, Craggett completed an application for insurance on the life of her son, George E. Craggett. Several questions regarding the health of her son were responded to. Mr. and Mrs. Craggett were listed as the beneficiaries of the policy. The application further provided that the policy carried a premium of $740.25, payable annually. Craggett acknowledged that her signature appears at the end of the application.

On June 15, 1971, policy No. 711630 was issued by Summit insuring the life of George E. Craggett in the amount of $25,000. In bold print, policy No. 711630 states that Summit is insuring the life of George Craggett and that it will pay $25,000 on due proof of his death. The policy schedule further states in enlarged, bold print that the $740.25 premium is payable annually. Craggett acknowledged receiving a copy of this policy at her home and acknowledged looking through the policy.

Craggett denied that Adell and Abraham ever told her that the dividends accumulated in policy No. 67896 would be used to fund a separate policy of insurance on the life of her son.

Craggett's deposition testimony also reveals that when she met with Adell and Abraham in June 1975, Adell allegedly told her again that the value of policy No. 67896 would be enhanced by the addition of younger children's names. Craggett stated that, based on this representation by Adell, she agreed to add her six-year-old granddaughter, Tamara V. Booker, to policy No. 67896.

On June 5, 1975, Craggett completed an application for insurance on the life of Tamara and listed herself as the primary beneficiary of the policy. The application stated that the policy's premium was payable annually. Craggett acknowledged that her signature appears at the bottom of the application.

Craggett denied that she was ever told by Adell and Abraham that dividends accumulated in policy No. 67896 would be used to fund a separate policy of insurance on the life of Tamara.

On June 15, 1975, Summit issued policy No. 7501829 insuring the life of Tamara in the face amount of $12,000. The policy states in bold print that Summit is insuring the life of Tamara V. Booker and that it will pay $12,000 on due proof of her death. The policy schedule further states in enlarged, bold print that the $336.60 premium is payable annually. Craggett acknowledged receiving a copy of the policy at her home and acknowledged looking through the policy.

The record further reveals that in May 1976, one month after Mr. Craggett died, Craggett applied for insurance on the life of her granddaughter, Eugenia V. Booker. During her deposition, Craggett testified that she also agreed to add her four-year-old granddaughter, Eugenia V. Booker, to policy No. 67896 to enhance its value.

Craggett denied that she was ever told by Adell and Abraham that dividends accumulated in policy No. 67896 would be used to fund a separate policy of insurance on the life of Eugenia. On May 25, 1976, Craggett completed an application for insurance on the life of Eugenia. Several questions regarding the health of Eugenia were responded to. Craggett was listed as the primary beneficiary of the policy. The application further provided that the policy carried a premium of $164.22, payable annually. Craggett acknowledged that her signature appears at the end of the application.

On June 3, 1976, policy No. 7603207 was issued by Summit, insuring the life of Eugenia Booker. In bold print, policy No. 7603207 states that it is insuring the life of Eugenia Booker and that it will pay $6,000 on due proof of her death. The policy schedule further states in enlarged, bold print that the $164.22 premium is payable annually. Craggett acknowledged receiving this policy at her home and looking through it.

In her affidavit, Craggett stated that before any of these purchases were made, she had informed Adell and Abraham that her investment goal was financial security for her retirement. Craggett further stated that she had developed a trusting relationship with Adell and Abraham and that they knew she was relying on their advice on ways to increase the value of her annuity policy.

In their affidavits, Adell and Abraham each stated that Craggett and her husband, while he was alive, were told that these were life insurance policies they were purchasing on the lives of their son and grandchildren and that the premiums would be funded from dividends accumulated in policy No. 67896. As further support of this contention, Adell attached and incorporated into his affidavit a copy of a Statement of Dividends and Endowments, signed by Craggett on May 26, 1980, directing AIA to apply the dividends and endowments from policy No. 67896 to pay the premiums due on policies Nos. 711630, 7501829 and 7603207.

Craggett acknowledged signing the Statement of Dividends and Endowments.

On May 12, 1992, the trial court granted AIA's motion for summary judgment without opinion. A timely notice of appeal was filed on June 10, 1992.

Craggett assigns as error the following:

"I. A fiduciary relationship exists between an insurance agency and its client, and therefore, an insurance agency shall be liable for losses where confidence has been reposed by the client, and dominion and power acquired by the insurance agency.

"II. A motion for summary judgment will not lie where there is a genuine issue of material fact for consideration.

"III. A person who has purchased a policy of insurance is not precluded from instituting a cause of action for return of premiums or any other action when no loss has occurred."

A court reviewing the grant of summary judgment must follow the standard set forth in Civ.R. 56(C), which specifically provides that before summary judgment may be granted, the movant must satisfy the following criteria:

" * * * (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from such evidence that reasonable minds can come to but one conclusion and, reviewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274.

It is well-settled law that the party seeking summary judgment bears the burden of showing that no genuine issue of material fact exists for trial. *Harless v. Willis Day Warehousing* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46. Where the evidentiary materials filed by the moving party establish the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, summary judgment must be granted. *Rodger v. McDonald's Restaurants of Ohio, Inc.* (1982), 8 Ohio App.3d 256, 8 OBR 347, 456 N.E.2d 1262.

With this standard in mind, we turn to Craggett's contentions.

Craggett's first and second assigned errors allege that the trial court improvidently granted AIA's motion for summary judgment. As these assignments are interrelated, we will address them jointly.

Although not entirely clear, Craggett seems to contend that summary judgment was inappropriate as there was evidence before the trial court that would have permitted a trier of fact to reasonably conclude that the parties had developed a de facto fiduciary relationship, during the course of which AIA, through its agents, intentionally made misrepresentations to her to induce her to purchase unneeded insurance policies, presumably to maximize their commissions.

Preliminarily, we note that one who alleges the tort of misrepresentation must show (1) a false representation by another, (2) made intentionally or negligently, (3) on which the recipient reasonably relied, (4) to his loss and detriment. *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101.

 Where a fiduciary relationship exists and the fiduciary obtains a benefit by virtue of the relationship, the law indulges in a presumption of misrepresentation; however, any such presumption of misrepresentation which arises may be rebutted. *Yost v. Woods* (July 11, 1988), Stark App. No. 7357, unreported, 1988 WL 73507. A rebuttal of such presumption is accomplished where it is shown that the plaintiff had competent and disinterested advice or that she entered into the transaction voluntarily, deliberately and advisedly, knowing its nature and effect, or that her consent was not obtained by reason of the power of the influence to which the relation gave rise. *McAdams v. McAdams* (1909), 80 Ohio St. 232, 88 N.E. 542. Further, once the presumption of misrepresentation has been rebutted by the alleged fiduciary, the burden shifts to the party asserting the misrepresentation to prove it. *Yost v. Woods, supra.*

 Therefore, the burden of proving the existence of a fiduciary relationship from which a presumption of misrepresentation arises belongs to the party asserting the misrepresentation, in this case, Craggett, and such proof must be shown by a preponderance of the evidence. *Yost v. Wood, supra.*

A fiduciary relationship is one in which "special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *Stone v. Davis* (1981), 66 Ohio St.2d 74, 20 O.O.3d 64, 419 N.E.2d 1094; *Haluka v. Baker* (1941), 66 Ohio App. 308, 20 O.O. 136, 34 N.E.2d 68; *Tool Steel Products Sales Corp. v. XTEK, Inc.* (Jan. 29, 1993), Hamilton App. No. C–910533, unreported, 1993 WL 19476. The fiduciary's role may be assumed by formal appointment or it may rise de facto from a more informal confidential relationship, *Prudential Ins. Co. v. Eslick* (S.D.Ohio 1984), 586 F.Supp. 763; *Walters v. First Natl. Bank of Newark* (1982), 69 Ohio St.2d 677, 23 O.O.3d 547, 433 N.E.2d 608, which is a relationship in which:

" ' * * * [O]ne person comes to rely on and trust another in his important affairs and the relations there involved are not necessarily legal, but may be moral, social, domestic, or merely personal. * * * ' *Indermill v. United Savings* (1982), 5 Ohio App.3d 243, 245, 5 OBR 530, 532, 451 N.E.2d 538, 540." *Applegate v. Fund for Constitutional Govt.* (1990), 70 Ohio App.3d 813, 816–817, 592 N.E.2d 878, 880–881.

Such a confidential relationship, however, cannot be unilateral. The Ohio Supreme Court has explained that a fiduciary duty may arise from an informal relationship only if both parties understand that a special trust or confidence has been reposed. *Nielsen Enterprises, Inc. v. Ins. Unlimited Agency, Inc.* (May 8, 1986), Franklin App. No. 85AP–781, unreported, 1986 WL 5411 (no fiduciary relationship exists between an insurance agent and client which would require the agent, during the term of an existing policy, to apprise the client of new insurance

offerings or to provide an interim review of the client's insurance coverage); *Roberts v. State Farm Mut. Auto. Ins. Co.* (Jan. 7, 1982), Cuyahoga App. No. 43388, unreported, 1982 WL 2284 ("[T]he relationship between an insurance salesman and his customer may take on fiduciary dimensions when reliance is reasonably reposed in the salesman by the customer."); *Umbaugh Pole Bldg. Co. v. Scott* (1979), 58 Ohio St.2d 282, 12 O.O.3d 279, 390 N.E.2d 320 (creditor's provision of advice and counselling to debtor in a congenial atmosphere not enough to create a fiduciary relationship); *Warren v. Percy Wilson Mtge. & Fin. Corp.* (1984), 15 Ohio App.3d 48, 15 OBR 76, 472 N.E.2d 364 (no fiduciary status arising from advice given in routine business relationship between debtor and creditor); *Blon v. Bank One* (1988), 35 Ohio St.3d 98, 519 N.E.2d 363 (no fiduciary status conferred in arm's-length business transaction).

Craggett argues that a fiduciary relationship existed between herself and AIA based on Abraham's and Adell's knowledge that she purchased policy No. 67896 from the Pinkney–Perry Agency as an investment for her retirement, and that they further knew she was relying on their advice and expertise on ways to increase the value of her annuity policy.

■ From our review of the record, we fail to perceive any evidence which, if reasonably construed, supports a finding that a confidential, special or fiduciary relationship existed between Craggett and AIA. There is simply no evidence which, if reasonably construed, would support a finding that Craggett's ongoing relationship with AIA was other than ordinary. Rather, the record reveals that Craggett relied more on the advice of her now-deceased husband than on the advice of Adell or Abraham. Indeed, Craggett said that although she personally never understood the agents' proposals, her husband had told her he understood what the agents were recommending and it was a good idea.

The record further reveals that Craggett's consent to the original transaction was not obtained by reason of some power or influence of Adell or Abraham but, rather, was obtained as a result of her husband's decision that they should do what the agents had proposed. Craggett specifically stated that, originally, she went along with her husband's decision to do what the agents had recommended. Nor is there any evidence in the record that Craggett detoured from her husband's original advice when she allegedly agreed simply to add her grand-daughters' names to policy No. 67896.

Unquestionably, these facts are inconsistent with an assertion that Craggett reposed some special or extraordinary trust in AIA. Accordingly, we must conclude that no fiduciary relationship existed between Craggett and AIA.

Having determined that no fiduciary relationship existed between the parties which would give rise to a presumption of undue influence or misrepresentation,

we turn our consideration to whether, absent any such presumption, summary judgment was warranted on Craggett's claim of misrepresentation. *Harless v. Willis Day Warehousing, supra.*

Absent a fiduciary relationship, an insurance sales agency has a duty to exercise good faith in obtaining only those policies of insurance which its customer requests. See *First Catholic Slovak Union v. Buckeye Union Ins. Co.* (1986), 27 Ohio App.3d 169, 27 OBR 202, 499 N.E.2d 1303; *Gordon v. Wade* (Aug. 8, 1991), Cuyahoga App. No. 61180, unreported, 1991 WL 398725. Correspondingly, a person has a duty to examine the coverage provided and is charged with knowledge of the contents of her own insurance policies. *Id.* An agent or broker is not liable when a customer's loss is due to the customer's own act or omission. See *Nofer v. Volanski Agency, Inc.* (Ohio C.P.1980), 414 N.E.2d 450.

In the instant case, the trial court could, quite properly, conclude that AIA provided Craggett with precisely those policies of insurance that she agreed to purchase. The evidence unequivocally establishes that Craggett completed and signed an application for each of the three disputed life insurance policies. Each application required personal and medical information about the prospective insured, as well as the name of the proposed beneficiary of the policy. Craggett listed herself as the beneficiary of each of the three policies. Moreover, Craggett, a college graduate, acknowledged looking at each of the policies when she received them. The front cover of each policy clearly states in enlarged, bold print that it is a life insurance policy, the policy number, the insured's name, the face value of the policy, and the amount of the annual premium. Even the most cursory glance at the policies should have revealed that they were separate policies of life insurance. Thus, it is only reasonable to expect that if the policies issued to Craggett were not what she wanted or expected, she would have contacted AIA to clear up any confusion or cancel the policies. Her retention of the policies without any further communications to AIA is tantamount to acceptance of the policies as issued.

There is also evidence in the record that Craggett knew the dividends and endowments from policy No. 67896 were being used to fund the premiums of the three life insurance policies. Craggett acknowledged signing the Statement of Dividends and Endowments which directed AIA to use the dividends and endowments from policy No. 67896 to pay the premiums due on the three life insurance policies. Consequently, we are left to conclude, as a matter of law, that Craggett was fully aware that dividends from policy No. 67896 were being used to fund the three additional policies of life insurance.

Based on all of the foregoing, the trial court's grant of summary judgment was proper because, in response to AIA's properly supported motion for summary

judgment, Craggett presented no specific facts showing there was a genuine issue as to any material fact, and AIA was entitled to judgment as a matter of law.

Summary judgment was also warranted under the applicable statute of limitations.

Under R.C. 2305.09, a cause of action for misrepresentation must be brought within four years after the misrepresentation was or should have been discovered. *Investors REIT One v. Jacobs* (1989), 46 Ohio St.3d 176, 546 N.E.2d 206; *Venham v. Astrolite Alloys* (1991), 73 Ohio App.3d 90, 596 N.E.2d 585, motion to certify overruled (1991), 62 Ohio St.3d 1422, 577 N.E.2d 1105.

No more than a reasonable opportunity to discover the misrepresentation is required to start the period of limitations. Information sufficient to alert a reasonable person to the possibility of wrongdoing gives rise to a party's duty to inquire into the matter with due diligence. *Id.;* see *Flowers v. Walker* (1992), 63 Ohio St.3d 546, 589 N.E.2d 1284.

Once sufficient indicia of misrepresentation are shown, a party cannot rely on its unawareness or the efforts of the opposition to lull it into a false sense of security to toll the period of limitations. See *Kimmelman v. Advest, Inc.* (Mar. 19, 1993), Lucas App. No. 920177, unreported, 1993 WL 77192.

Here, each of the policies issued to Craggett clearly stated on its cover in enlarged, bold print that it was a life insurance policy payable upon due proof of the insured's death, the name of the insured, the face value of the policy, and the policy number. This information was sufficient to require a reasonable person who believed she was simply adding a name to an existing policy to inquire into the possibility of wrongdoing. Insurance customers are not free to ignore warning signals which would cause a reasonable person to ask questions.

Inasmuch as Craggett failed to assert her claims of misrepresentation within four years of the various dates she received and reviewed the policies, the dates she should have discovered the alleged misrepresentation, her claims are barred by the applicable statute of limitations.

Even giving Craggett the benefit of all reasonable inferences by assuming, *arguendo,* that the policies themselves were not sufficient indicia of misrepresentation to trigger the period of limitations, the May 26, 1980 Statement of Dividends and Endowments was certainly sufficient information to trigger Craggett's duty to investigate the alleged misrepresentation. Craggett similarly failed to assert her misrepresentation claim within four years of the date she signed the Statement of Dividends and Endowments, the date by which she should have discovered AIA's alleged misrepresentations. Thus, the trial court correctly

determined that summary judgment was appropriate under the applicable statute of limitations.

Accordingly, Craggett's first and second assignments of error are overruled.

In her third assignment of error, Craggett contends that a person who has purchased a policy of insurance is not precluded from instituting a cause of action for a return of premiums, or any other action, when no loss occurs. In support of this assigned error, Craggett incorporates the arguments from her first and second assigned errors and submits that these arguments address her third assignment of error. Upon review of these arguments in this light, we cannot agree that this assignment of error is addressed therein. Accordingly, pursuant to App.R. 12(A)(2) and 16, we overrule Craggett's third assignment of error.

*Judgment affirmed.*

PATTON, P.J., and KRUPANSKY, J., concur.